No. 00-048

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 330

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

VANCE LEON POPE,

        Defendant and Appellant.


APPEAL FROM:    District Court of the Fourth Judicial District,
In and for the County of Missoula, Cause No. DC-93-10941,
The Honorable Ed McLean, Judge presiding.


COUNSEL OF RECORD:

        For Appellant:

            Chad Wright (argued), Appellate Defender Officer, Helena, Montana

        For Respondent:

            Hon. Mike McGrath, Attorney General; Cregg W. Coughlin (argued),
Assistant Attorney General, Helena, Montana

            Fred Van Valkenburg, Missoula County Attorney, Missoula, Montana


                Argued and Submitted:  June 19, 2003

                       Decided:  December 2, 2003

Filed:

_____
               Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 The Defendant, Vance Pope (Pope), was convicted of sexual intercourse without consent and kidnaping on June 29, 1994, in the District Court for the Fourth Judicial District, Missoula County. He filed a petition for postconviction relief on September 8, 1999. The District Court denied that petition and he appealed. We reversed the District Court and remanded his petition for a full evidentiary hearing. Following the hearing, the District Court determined that Pope did not prove sufficient facts to overcome the five year statute of limitations and concluded that Pope's petition for postconviction relief was statutorily barred by § 46-21-102, MCA (1993). Pope appeals from that order. We reverse the judgment of the District Court and remand for a new trial.

¶2 The sole issue on appeal is whether the District Court was correct when it concluded that Pope's petition for postconviction relief was barred by § 46-21-102, MCA (1993).

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 On December 17, 1993, Pope was charged with sexual intercourse without consent and kidnaping. Two women, A.J. and M.J., alleged that Pope and co-defendant, Randy Plumley (Plumley), forced them to engage in sexual intercourse and restrained them against their will on or about November 29, 1993.

¶4 An amended information was filed against Pope on April 21, 1994. The amended information provided in part:

> COUNT I: On or about November 29, 1993, the above-named Defendant knowingly had sexual intercourse without consent with Jane Doe and/or Susan Doe. Both suffered bodily injury.
> COUNT II: On or about November 29, 1993, the above-named Defendant

2

purposely or knowingly and without lawful authority restrained Jane Doe and Susan Doe by using and/or threatening to use physical force.

¶5 Simultaneously, Pope entered a plea agreement with the State. He agreed to give a truthful account of the events that took place on November 29, 1993, and testify against Plumley in exchange for concurrent ten year sentences on the two counts, designation as a non-dangerous offender, and a recommendation that his sentence be served without the possibility of parole until sexual offender and alcohol counseling were completed.

¶6 Pursuant to the plea agreement, Pope made a sworn statement of the facts on April 21, 1994. The interview was conducted by Detective Dave Fowlkes and County Attorneys Karen Townsend (Townsend) and Robert Zimmerman. Townsend made the following statement before Pope recounted the events that took place on November 29: "Okay, and do you understand that what we are asking for in this statement is the truth about the facts of November the 29th, and that ah, that this statement if the plea doesn't go through will not be used against you in any court proceeding, do you understand that?" Pope answered in the affirmative.

¶7 During that interview, Pope testified that he and Plumley met A.J. and M.J. while partying at Connie's Lounge in Missoula. According to his story, everyone was intoxicated and the women were flirting with him. A group of people including Pope, Plumley and the women moved the party to a hotel room when the bar closed down. The group continued to consume hard liquor. Following an altercation between Pope and another man, the police arrived and the party was broken up. Pope and Plumley agreed to give A.J. and M.J. a ride to Elmo, Montana. Pope was driving the vehicle.

3

¶8    During the drive, Pope claims that he asked A.J., who was in the passenger's seat, to perform oral sex on him. He maintains that A.J. willingly performed oral sex on him. Soon thereafter, Pope and A.J. realized that Plumley was in the rear seat forcing M.J. to have sex with him. A.J. became frantic when she realized what was happening and burned Pope's face with a dash board cigarette lighter. Pope hit her for burning his face and then A.J. jumped out of the vehicle while it was still moving.

¶9    Pope pulled the vehicle over to let Plumley drive and saw M.J. in the back seat. At this time he had intercourse with her. When asked whether M.J. willingly engaged in sex with him, Pope stated:

> Not to [Plumley], no. Then when I got out of the car and she sees me standing there, I looked down at the car and ah she said with a really, I know she was just doing it out of fear . . . . But she looked up at me and says I suppose you want some of me too.
>
> . . . .
>
> The fact of the matter is my friend [Plumley] beat and raped [M.J.] in the back seat, [A.J.] got scared and jumped out of the fucking car, and then I made the stupid ass mistake of violating [M.J.] when she was laying there vulnerable.

¶10    A plea hearing was held that same day, at which time Pope testified that he engaged in sexual intercourse without consent with M.J. on November 29, 1993. When asked what he was pleading guilty to, Pope stated:

> Ah, picked some girls up and were driving down the interstate with them, and my co-defendant had raped one of the girls in the back seat, and I got out to urinate, and she looked up, and because she was scared she asked if I would like some of her, too, and I knew she was just doing it to fear for her life, and I proceeded to hop in back and violated her.

¶11    The District Court refused to accept the terms of the plea agreement and Pope was

4

permitted to withdraw his guilty plea. Subsequently, a jury trial was held on June 27, 28 and 29, 1994.

¶12    At trial, A.J. testified that she fell asleep in the vehicle after the four left the hotel room in Pope's vehicle. She awoke to M.J.'s plea for Plumley to stop. When she turned around Plumley was on top of M.J. with his pants down. She attempted to stop Plumley and asked Pope to stop the car, but Pope began assaulting her. At that time he forced her to perform oral sex on him. A.J. testified that she retaliated and burned Pope's face with the vehicle's dashboard cigarette lighter. Pope then became angry. He told her to take off her pants and she jumped out of the vehicle instead.

¶13    On direct examination, M.J. testified that when she was in the back seat with Plumley he forced her to perform oral sex on him and then forced her to have sex with him. M.J. also testified that she witnessed Pope force A.J. to perform oral sex, although she did not hear what was said in the front seat. She was not certain if Pope was in the back seat with her at any time and could not remember if the two engaged in sex.

¶14    Julie Long (Long), a forensic serologist, testified as to the physical evidence that was collected in M.J.'s "rape kit." The rape kit, which was collected following M.J.'s arrival at the hospital, consisted of several articles of M.J.'s clothing, blood samples taken from M.J., and the results from a vaginal swab taken from M.J. Long also testified regarding standard kits submitted by Pope and Plumley. Based on this evidence, Long testified that M.J. had ABO type O blood and both Pope and Plumley had ABO type A blood, but Pope was an A secretor while Plumley was a non-secretor. A "secretor" is a person whose blood type can

5

be detected in his or her saliva, semen, and vaginal fluids. Long explained that the presence of type A blood in semen samples taken from M.J.'s clothing would indicate that Pope was the source of the substance.

¶15    Consequently, Long attributed various semen samples taken from M.J.'s rape kit to Pope because those samples tested positive for type A blood. She made the following statements at trial:

> Out of these three people, Mr. Pope is the only one that could be the source of these three people that were sampled, because he is the only one that is an A secretor in these three individuals here.
>
> . . . .
>
> The presence of the A substance, yes, has to come from the semen donor, and with just these two male individuals that would just be Mr. Pope.

¶16    Long acknowledged that the DNA tests performed by Cellmark Diagnostics (Cellmark) on M.J.'s underwear were incomplete at the time of trial. The report submitted at trial did not indicate the presence of Pope's DNA in the vaginal swab or on the underwear. The report indicated that when the testing was completed another report would be issued that may provide additional information with regard to the DNA found on M.J.'s underwear.

¶17    Witnesses from the hospital who treated the women following the incident testified as well. Hospital personnel specifically testified as to the emotional and physical state of the women when they arrived at the hospital. All of the testimony indicated that the women were in an excited state and upset about one another and the events that had unfolded that evening. Sheriff's department personnel who interviewed the victims and Pope also testified about those interviews and the evidence gathered for the case.

¶18     Pope did not testify at trial. The defense theory was that the encounter with both women was consensual and that the story told by them was unreliable. The theory focused on inconsistencies in the women's personal accounts of the evening, the inconsistencies in their stories throughout the prosecution, and the level of their intoxication.

¶19     The following instructions were given to the jury:

> To convict the defendant of sexual intercourse without consent with [M.J.] and/or [A.J.], the State must prove the following elements:
> 1. That the defendant subjected [M.J.] and/or [A.J.] to sexual intercourse and without consent;
> 2. That the act of sexual intercourse was without the consent of [M.J.] and/or [A.J.]; and
> 3. That the defendant acted knowingly.
> If you find from your consideration of the evidence that all of these elements have been proved beyond a reasonable doubt, then you should find the defendant guilty.
> If, on the other hand, you find from your consideration of the evidence that any of these elements has not been proved beyond a reasonable doubt then you should find the defendant not guilty.

¶20     On June 29, 1994, the jury found Pope guilty "[t]o the charge of Sexual Intercourse Without Consent with respect to [M.J.] and/or [A.J.]." On July 25, 1994, the District Court gave Pope a thirty year sentence for sexual intercourse without consent and a ten year sentence for kidnaping. The sentences were to run consecutively. Pope filed an application for sentence review which was granted. His sentence for Count I was reduced to twenty years and his sentence for Count II was changed to a ten-year suspended sentence. Pope did not appeal his conviction.

¶21     Pope filed a pro se "Notice of Intent to File Post Conviction Relief" on February 5, 1999. On February 17, 1999, Pope filed a request for status of cause in which he inquired

about a request for production he filed on December 14, 1998. The Honorable Ed McLean assumed jurisdiction over the case on March 26, 1999. On April 5, 1999, Pope filed "Defendant's Second Request for Production of Documents" and requested the entire court file, all transcripts, all documents created by and in the possession of the Missoula County Attorney's office, and any other documents created in connection with his case. The second request was denied by a court order.

¶22 On April 16, 1999, Pope filed a separate request for transcripts for the stated purpose of preparing his petition for postconviction relief. That request was also denied.

¶23 Pope also requested that Cellmark, the lab doing the DNA testing, send him a copy of its report directly. However, Cellmark informed him that the report could only be sent to its client, Montana State Crime Lab.

¶24 Subsequently, on September 8, 1999, Pope filed a pro se petition for postconviction relief, in which he alleged that the State presented inaccurate and confusing DNA evidence which was calculated to produce a wrongful conviction. Additionally, he maintained that defense counsel's failure to object to the introduction of that DNA evidence constituted ineffective assistance of counsel. Therefore, he requested a new trial.

¶25 The State maintained that Pope's petition was procedurally barred by the statute of limitations, § 46-21-102, MCA, and procedurally barred because the issues were not properly raised on direct appeal. Irregardless, the State also contended that Pope's allegations were not supported by the record and should be denied on the merits as a matter of law.

¶26 The District Court denied the petition and stated:

It is the opinion of the Court having reviewed the Affidavit in Support of the Motions to file an Information, the Amended Information, Transcript of the guilty plea colloquy and the statement of Defendant Vance Pope, the Sentencing Memorandum and the Judgment, that no grounds exist for post conviction relief.

¶27 This Court appointed counsel to represent Pope on appeal in February of 2000. In December of 2000, counsel requested the completed results from all DNA tests that were conducted by Cellmark. An Appellant's brief was filed and the State responded, maintaining that Pope's claim of complete DNA evidence was speculative.

¶28 Subsequently, on March 21, 2001, Pope's counsel received the requested DNA results. The report was completed and sent to Long in August of 1994. However, the report was misplaced by the Sheriff's department and did not surface until it was discovered in 2001. The report indicated that none of the DNA present on M.J.'s underwear matched Pope. The DNA present matched Plumley and M.J. The DNA from a third unknown party was present as well. Pope filed a motion to supplement the record on appeal and requested that the complete DNA report be considered by the court. The State responded that the complete DNA results were not relevant to Pope's appeal and that supplementing the record was unnecessary.

¶29 This Court reversed the District Court's denial of Pope's petition for postconviction relief and remanded the case for a full hearing on the merits. We further ordered the court to supplement the record with the DNA evidence for the postconviction hearing. The court was also ordered to consider the statute of limitations bar raised by the State. A hearing was held in the District Court on June 20, 2001.

9

¶30    James Streeter (Streeter), a DNA expert, reviewed the complete DNA test results and offered his opinion on how the new DNA data impacted Long's testimony and the blood type testing presented at Pope's trial. He remarked that the two results were incompatible and that the blood type results should be re-analyzed in light of the DNA evidence. He testified that Pope's DNA was not present. The only DNA present was that of Plumley, M.J. and a third unknown source. Streeter hypothesized that the presence of type A blood detected by Long was actually that of the unknown third DNA source since Pope's DNA was not present. In his opinion, the DNA evidence called into question Long's testimony at trial.

¶31    Streeter admitted that if Pope wore a condom or had a vasectomy his DNA would not be present. However, the prosecution relied upon type A blood evidence found in seminal fluids, which would not have been present if Pope wore a condom. Furthermore, there was no evidence that Pope had a vasectomy. Streeter stated: "So to make the assumption that the A activity that was detected in the seminal fluid could have come from Mr. Pope, we would have expected Mr. Pope's DNA to be present, which it wasn't."

¶32    Long testified that the completed DNA report would not change her testimony from that given at Pope's trial. She was of the opinion that the absence of Pope's DNA did not indicate that the blood type testing she conducted was inaccurate because this testing was based on fluid, not cell matter. She speculated that Pope's DNA may not have been detected because the sample contained insufficient cell matter or sperm, or the DNA from the sample had deteriorated. Therefore, she opined the lack of DNA evidence in the cell samples did not contradict the blood type evidence.

¶33 Long admitted that the unknown DNA source could be responsible for the type A blood indicators if that person was an A secretor. Moreover, she could not identify Pope as someone who engaged in sexual intercourse with M.J. based upon the completed DNA report alone.

¶34 The District Court concluded that the claims raised in Pope's postconviction appeal were barred by § 46-21-102, MCA (1993). It stated that the jurisdictional bar could only be overcome by "a clear miscarriage of justice, one so obvious that the judgment is rendered a complete nullity. The miscarriage of justice exception is a narrow one and does not apply unless the defendant did not commit the offense."

¶35 The court found that the DNA evidence was not "newly discovered" because Pope's counsel was aware that the DNA test was incomplete and could have requested a copy upon completion. Irregardless, the court found that the DNA evidence failed to establish that Pope did not commit the crime. The court relied, in part, upon an inadmissible confession made by Pope when it stated that: "Pope readily admitted that he hurt, threatened and coerced [A.J.] into performing oral sex on him . . . . Pope further admitted that after [A.J.] had jumped from out of the moving vehicle, he had non-consensual vaginal sexual intercourse with [M.J.]." The court concluded that, while the plea admission was not admissible in a trial setting, it could be considered under the circumstances of Pope's postconviction appeal because it refuted his claim that he was innocent of the crime.

¶36 Pope now appeals the court's order denying his petition. In addition to the constitutional errors alleged in his original petition, Pope alleges that the jury instruction

11

used to convict him of sexual intercourse without consent violated his constitutional right to a unanimous jury, that prosecutorial misconduct denied him a fair trial, that the completed DNA evidence casts serious doubt on the reliability of his conviction, that the District Court considered an inadmissible statement in its order, and, therefore, the circumstances of this case require a tolling of the statute of limitations.

## DISCUSSION

¶37    The sole issue before this Court is whether the District Court was correct when it determined that Pope's petition for postconviction relief was barred by § 46-21-102, MCA (1993).

¶38    Pope maintains that the completed DNA evidence satisfies the "actual innocence" gateway, permitting the review of his otherwise barred petition for postconviction relief as provided for in *Schlup v. Delo* (1995), 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.  He maintains that it is impossible to determine which set of facts and for which woman he was convicted based on the jury instruction and the jury's verdict.  Because the complete DNA report casts serious doubt on whether a jury could find him guilty of raping M.J., he argues that the statute of limitations must be tolled and that he is entitled to have his claims of constitutional error reviewed on their merits.  He alternatively argues that the State failed to contest his constitutional error allegations and, therefore, he is entitled to a new trial.  Pope does not appeal his conviction for kidnaping.

¶39    The State maintains that Pope is barred from pursuing his claims by § 46-21-102, MCA (1993).  Specifically, the State asserts the complete DNA results do not establish that

12

Pope did not commit the crime for which he was convicted and, therefore, he has failed to prove he is actually innocent. It also contends that the District Court was permitted to consider Pope's confession when it denied his petition because the confession, admissible or not, demonstrates that Pope actually committed the crime. The State does not address Pope's claims regarding the constitutional infirmity of his trial in its brief.

¶40     In *Herrera v. Collins* (1993), 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203, the Supreme Court considered Herrera's second federal habeas petition, in which he alleged that he was actually innocent of the crime for which he had been convicted and that his execution would violate the prohibition against cruel and unusual punishment and the guarantee of due process. Herrera alleged that newly discovered evidence, in the form of affidavits submitted ten years after his conviction, indicated Herrera's brother had committed the murders for which he had been convicted. He maintained that he was entitled to a new trial despite the fact that the state court did not have jurisdiction to grant a new trial based on newly discovered evidence because the statute of limitations for bringing such a claim had passed.

¶41     Herrera did not attribute his conviction to an error at his trial, rather he asserted that it would be constitutionally intolerable to execute him because he was in fact innocent of the crimes for which he had been convicted. In a concurring opinion, Justice O'Connor attributed significant importance to the lack of an underlying constitutional claim. She noted that it was appropriate to impose an extraordinarily high standard of review for a petitioner who has benefitted from the full panoply of constitutional protections afforded criminal defendants. *Herrera*, 506 U.S. at 419-20, 113 S.Ct. at 870.

13

¶42     The affidavits relied upon by Herrera were reviewed by the court in light of the evidence presented at trial by the prosecution.  The court remarked that the affidavits were inconsistent with one another, were not subject to cross examination, the individual identified as the guilty party was deceased, and, for the most part, the affidavits consisted of hearsay.  *Herrera*, 506 U.S. at 417-18, 113 S.Ct. at 869-70.  It further noted that the prosecution produced two eyewitness statements and a written statement by Herrera himself, all of which indicated that he was the guilty party.  *Herrera*, 506 U.S. at 418, 113 S.Ct. at 870.  Consequently, the court held that Herrera failed to satisfy the threshold showing of actual innocence required of a defendant who has been convicted of a crime following a constitutionally error free trial.  *Herrera*, 506 U.S. at 418-19, 113 S.Ct. at 870.

¶43     In *Schlup*, the Supreme Court considered a second habeas corpus petition in which Schlup alleged that a constitutional error in his trial deprived the jury of critical evidence that established his innocence.  The district court had denied Schlup's petition and held that he did not demonstrate clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found him guilty pursuant to *Sawyer v. Whitley* (1992), 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269.  *Schlup*, 513 U.S. at 301, 115 S.Ct. at 854.

¶44     The nature of Schlup's petition and claim for relief was critical to the court's disposition.  Schlup's claim of innocence was not the lone basis for his request for relief.  Rather, it was offered only to support his claim that he fit within the "narrow class of cases . . . implicating a fundamental miscarriage of justice."  *Schlup*, 513 U.S. at 314, 115 S.Ct. at 860 (citation omitted).  Schlup's procedural claim of actual innocence accompanied by an

allegation of constitutional error was distinguished from the substantive claim of actual innocence raised in *Herrera*. *Schlup*, 513 U.S. at 314-15, 115 S.Ct. at 860-61. Herrera's conviction was presumed to be error free and, therefore, the bar for relief raised. The court noted that when a conviction is not error free, the standard of producing evidence of innocence carries a lower burden. *See Schlup*, 513 U.S. at 316, 115 S.Ct. at 861. The court stated:

> Schlup's conviction may not be entitled to the same degree of respect as one, such as Herrera's, that is the product of an error-free trial. . . . However, if a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.
> Consequently, Schlup's evidence of innocence need carry less of a burden.

*Schlup*, 513 U.S. at 316, 115 S.Ct. at 861.

¶45 Schlup's claim of innocence acted as the "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315, 115 S.Ct. at 861 (citation omitted). The court held that the standard provided for in *Murray v. Carrier* (1986), 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397, applied to Schlup's claim rather than the *Sawyer* standard relied upon by the district court. *Schlup*, 513 U.S. at 326-27, 115 S.Ct. at 867.

¶46 Pursuant to *Carrier,* a petitioner must demonstrate that a constitutional violation at trial has probably resulted in the conviction of an individual who is "actually innocent." *Carrier*, 477 U.S. at 496, 106 S.Ct. at 2649-50. The claim must be supported by new

evidence–evidence not presented to the jury at trial–that indicates the petitioner is actually innocent. The need for new evidence prevents a flood of meritless claims because the discovery of new evidence capable of satisfying the standard is rare. *Carrier* is satisfied when a petitioner demonstrates that there is a probability, in light of the new evidence, no reasonable juror would have found the defendant guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327, 115 S.Ct. at 867.

¶47    In *Schlup*, the court held that Schlup need only show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 329, 115 S.Ct. at 868. Importantly, the court remarked that the innocence inquiry "must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence." *Schlup*, 513 U.S. at 328, 115 S.Ct. at 867-68.

¶48    Actual innocence is different in a *Herrera* petition and a *Schlup* petition. Use of the term "actual innocence" in both cases has blurred the meaning of the phrase. A *Herrera* petitioner must satisfy a higher standard and provide more convincing evidence of innocence–evidence that he did not commit the crime for which he was convicted–because his or her trial was error free; thus, the full panoply of constitutional protections has been provided to the petitioner. The claim of innocence stands alone before the court and must be more convincing than a claim accompanied by other alleged infirmities. The court intentionally distinguished the two types of claims and noted the higher *Herrera* standard:

> As we have explained, . . . Schlup's claim of innocence is fundamentally different from the claim advanced in *Herrera*. The standard that we apply

16

today, therefore, will not foreclose the application of factual innocence to the analysis of such claims.

*Schlup*, 513 U.S. at 328, n.47, 115 S.Ct. at 868, n.47. A *Herrera* petitioner must present new evidence that proves he or she did not commit the crime to be "actually innocent."

¶49 However, under the *Schlup* standard, a petitioner need only demonstrate that a constitutional violation at trial has probably resulted in the conviction of an individual whom no reasonable juror would have found guilty beyond a reasonable doubt in order to satisfy actual innocence. Actual innocence in this context must reflect the fundamental criminal canon of proof beyond a reasonable doubt that delineates innocence and guilt in a court of law. The petitioner need not prove that he did not commit the crime, he only has to be successful in convincing the reviewing court that a reasonable jury would not likely convict him in light of the new evidence.

¶50 This distinction was recognized by the Ninth Circuit Court of Appeals in *Carriger v. Stewart* (9th Cir. 1997), 132 F.3d 463. The Ninth Circuit emphasized that a *Schlup* petitioner need not affirmatively prove that he is actually innocent. Rather, he must prove that it is more likely than not that no reasonable juror would have convicted him beyond a reasonable doubt in light of all of the evidence now available. *Carriger*, 132 F.3d at 477.

¶51 Numerous Montana cases have considered what a petitioner must prove to overcome the jurisdictional bar presented by the statute of limitations set forth for postconviction relief petitions. We continue to recognize the importance and public interest in the finality of judgments. *See In re Gray* (1995), 274 Mont. 1, 908 P.2d 1352; *State v. Perry* (1988), 232 Mont. 455, 463, 758 P.2d 268, 273. Consequently, § 46-21-102, MCA, has been construed

as a jurisdictional bar on petitions for postconviction relief that may only be waived when there is a "clear miscarriage of justice, one so obvious that the judgment is rendered a complete nullity." *Gray*, 274 Mont. at 2, 908 P.2d at 1352. Moreover, we have held that the miscarriage of justice exception does not apply unless the defendant did not commit the crime from which he seeks relief. *Beach v. Day* (1996), 275 Mont. 370, 374, 913 P.2d 622, 624.

¶52    More recently, in *State v. Redcrow*, 1999 MT 95, 294 Mont. 252, 980 P.2d 622, this Court considered what a petitioner for postconviction relief was required to demonstrate in order to overcome § 46-21-102, MCA. We noted that § 46-21-102, MCA, represented a jurisdictional bar on litigation. We recognized the general principle that a clear miscarriage of justice rendering the judgement a complete nullity would be required to overcome that jurisdictional bar.

¶53    In *Redcrow*, ¶ 33, quoting *Schlup,* 513 U.S. at 329, 115 S.Ct. at 868, we provided the following definition of actual innocence:  "Actual innocence 'does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty.'"  We further relied upon *Sawyer* for the proposition that the miscarriage of justice exception is concerned with actual and not legal innocence. *Redcrow*, ¶ 33. The reliance upon *Sawyer* imposes a higher burden upon a petitioner whose claim has been barred by the statute of limitations. It has been noted by both parties here that this Court adopted the more demanding *Herrera* type standard in *Redcrow*.

¶54	Turning to the instant case, the District Court concluded that Pope was required to show that he was truly innocent of the charges for which he had been convicted to satisfy the "actual innocence" standard. The State relies upon *Redcrow* in confirming the District Court. However, Redcrow's petition was fundamentally different than Pope's petition. There was no "new evidence" included in Redcrow's petition: "because all of Redcrow's claims regarding ineffective assistance of counsel are record-based and not properly described as new evidence, the claims could have been presented prior to the expiration of the five-year statute of limitations." *Redcrow*, ¶ 38. Consequently, the necessary gateway evidence was not produced in that case. Similarly, the cases relied upon by the State and the District Court for the proposition that a defendant must produce evidence that he or she did not commit the crime are factually distinct from Pope's case.

¶55	Pope maintains that he was denied his fundamental right to a unanimous jury by the instruction which indicated he could be convicted if the jury found he was guilty of having sexual intercourse without consent with either A.J. or M.J. This point is not, and could not be, reasonably contested by the State. He further maintains that prosecutorial misconduct and ineffective assistance of counsel denied him the right to a fair trial. Finally, he asserts that the State withheld exculpatory evidence in violation of Montana law. Similar to *Schlup*, the DNA evidence has been presented to implore this Court to hear his otherwise barred constitutional claims:

> [Schlup's] constitutional claims are based not on his innocence, but rather on his contention that the ineffectiveness of his counsel, . . . and the withholding of evidence by the prosecution, . . . denied him the full panoply of protections afforded to criminal defendants by the Constitution.

19

*Schlup*, 513 U.S. at 314, 115 S.Ct at 860 (citations omitted). Pope has not made a substantive claim that the DNA evidence proves that he is truly innocent. Consequently, we conclude that his claim must be reviewed pursuant to the standard of review adopted by the Supreme Court in *Schlup*.

¶56     We note that the District Court concluded that the completed DNA evidence did not qualify as "newly discovered" evidence because Pope and his trial counsel were aware of the pending report. Consequently, the evidence was discoverable. While this may be true, Pope has not requested a new trial based upon newly discovered evidence. Instead, Pope submits the completed DNA evidence for the purpose of passing through the *Schlup* "actual innocence" gateway. The fact that the evidence was not presented to the jury because it was not available at the time of trial is sufficient to satisfy the threshold of being new evidence for purposes of applying an analysis under *Schlup*.

¶57     Therefore, we conclude that the standard adopted by this Court in *Redcrow* is inapplicable to the circumstances before us. Furthermore, *Schlup* establishes that Pope only needed to demonstrate that, in light of the new evidence, a reasonable juror would, more likely than not, find that the State did not prove he was guilty of the crime for which he was convicted. Therefore, we conclude that the District Court was incorrect when it concluded that Pope had to prove that he did not commit the crime to overcome the statutory bar.

¶58     Pursuant to *Schlup*, this Court must consider how a reasonable juror would view the new evidence:

> [T]he standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner

20

does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*Schlup*, 513 U.S. at 329, 115 S.Ct. at 868. Furthermore, a court is authorized to consider all evidence, wrongfully admitted or wrongfully excluded from trial:

> In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. . . . The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

*Schlup*, 513 U.S. at 327-28, 115 S.Ct. at 867 (citation omitted).

¶59 The *Schlup* actual innocence inquiry does not concern itself with the merits of the constitutional error claims raised by a defendant. According to *Schlup*, the actual innocence inquiry is conducted from the perspective of a properly instructed reasonable juror. A properly instructed juror in this case would have been given separate instructions for each victim. Because of the "and/or" jury instruction format, it is impossible to determine whether the jury convicted Pope of raping A.J., M.J., or both. We conduct our review of the evidence accordingly.

¶60 The complete DNA report tends to deflate the State's evidence that Pope had intercourse with M.J. While it does not exclude the possibility that he had intercourse with M.J., he cannot be included as a sperm donor based upon the DNA results. The DNA results indicate the presence of a third unknown party. Streeter testified that the unknown party,

whose presence is indicated by the DNA test, could have been the type A blood source that Long attributed to Pope. Moreover, in light of the DNA evidence, Long's testimony and blood type testing is inconclusive. The DNA evidence topples the State's theory presented to the jury: "[I]f you find that there was a substance in the vaginal fluid and in the panties, that had drained into the panties, you are going to find that that - - of the blood testing that was done, the only possible contributor for that is the defendant, Vance Pope."

¶61 Other than the blood type evidence that is contradicted by the new DNA evidence, there was little evidence presented at trial from which a reasonable juror could find that Pope had intercourse with M.J., consensual or non-consensual. There was no other physical evidence. At trial, M.J. was unable to recall whether or not Pope had sex with her. She only testified that Plumley raped her while Pope was driving. Nor could A.J. testify that Pope had intercourse with M.J. because she was not in the car when the alleged act took place.

¶62 The State suggests that this Court is authorized to consider the confession Pope made in his failed plea agreement. In fact, the District Court relied upon that statement in its order. It held that, in light of that statement, Pope could not demonstrate that he did not rape M.J. However, *Schlup* only permits this Court to review the record and new evidence to make a determination of what a reasonable juror would find. While a court may consider wrongfully excluded or admitted evidence, nothing suggests that a court may consider evidence that the State agreed it would not use in any court proceeding. The confession made by Pope in his plea negotiations could only be presented to a jury for impeachment purposes. We can foresee no circumstance under which Pope would need to testify and risk impeachment.

22

Therefore, we conclude that the District Court abused its discretion when it relied upon the failed plea confession to determine that Pope was not "actually innocent."

¶63     The only admissible evidence of intercourse that could be presented to a jury is the blood analysis testimony presented by Long's and Streeter's testimony based upon the completed DNA tests. The completed DNA evidence favors Pope. Therefore, we conclude that it is probable no reasonable juror would have found beyond a reasonable doubt that Pope was guilty of having non-consensual sexual intercourse with M.J.

¶64     The evidence against Pope for raping A.J. is indeed stronger. A.J. testified that she was forced to perform oral sex on Pope. M.J. testified that she observed Pope force A.J. to perform oral sex on him from the back seat of the vehicle. A.J. testified that she burned Pope with a lighter in an attempt to stop the forced encounter and that she jumped from the vehicle out of fear for her life. When Pope was brought in for questioning, he had a burn on his face that corresponded with A.J.'s claim. Furthermore, the area where A.J. made initial contact with the authorities for help and the injuries she was treated for at the hospital corresponded with the claim that she jumped from the vehicle.

¶65     We note that the District Court was incorrect when it found that "Pope readily admitted that he hurt, threatened and coerced [A.J.] into performing oral sex on him . . . ." Our review of the record indicates that Pope maintained that his encounter with A.J. was consensual at all times. Consequently, Pope could testify that A.J. consensually performed oral sex on him and not be impeached by his confession. He could also assert that both A.J. and M.J. were so intoxicated that they cannot be believed.

¶66 However, whether Pope would have been convicted by a properly instructed jury of sexual intercourse without A.J.'s consent, we cannot tell. Again, because of the alternate "and/or" jury instructions, we simply have no way of telling whether the jury convicted him of raping A.J. in the first place, rather than M.J. Thus, we have no way to conclude that Pope would have been found guilty beyond a reasonable doubt by a properly instructed jury, to have raped A.J.

¶67 As stated above, whether or not the statute of limitations may be waived turns upon whether a reasonable juror would, more likely than not, find that the State failed to satisfy the burden of proof beyond a reasonable doubt in light of the complete DNA report. In this case, we conclude that Pope has satisfied the actual innocence burden imposed by *Schlup* as to his conviction for sexual intercourse without consent.

¶68 Consequently, Pope has passed through the *Schlup* actual innocence gateway and his constitutional claims are not jurisdictionally barred. Further, it is obvious from the instructions given, and the verdict itself, that Pope's conviction is constitutionally infirm. As mentioned, the State does not contest this point.

¶69 It is true that Pope did not appeal his conviction. The glaring error of using "and/or" in the alternative charge, the jury instructions, and the verdict are, to say the least, record based. However, the new evidence Pope was initially denied, but has now presented, remains sufficient under the standards articulated in *Schlup* to create a gateway enabling him to escape through the procedural bar created by § 46-21-102, MCA (1993). When such new evidence is considered in conjunction with the faulty charge against him and the egregious

jury charge, we conclude that a waiver of the time bar is required in this instance as Pope's conviction is the result of "a clear miscarriage of justice, one so obvious that the judgment is rendered a complete nullity." *Gray,* 274 Mont. at 2, 908 P.2d at 1352.

## CONCLUSION

¶70 Pope having met the narrow applicable criteria to enable him to maintain a petition for postconviction relief beyond the five year period specified in § 46-21-102, MCA (1993), we reverse the order of the District Court dismissing such petition. The State not having contested Pope's claim that his conviction is constitutionally infirm, we reverse the judgment of the District Court and remand for a new trial on the charge of sexual intercourse without consent.

/S/ JOHN WARNER

We Concur:

/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER

Justice James C. Nelson specially concurs.

¶71   I concur in our decision.  I write separately only to emphasize a point alluded to at

¶ 66.

¶72   As I stated in my concurrence to our decision in *State v. Weldy* (1995), 273 Mont. 68,

80, 902 P.2d 1, 8, the failure to give a specific unanimity instruction followed as a natural

consequence of the way Pope was charged.  The amended information charged Pope in

Count I as follows:

> On or about November 29, 1993, the above-named Defendant knowingly had
> sexual intercourse without consent with Jane Doe and/or Susan Doe.  Both
> suffered bodily injury.[1]

¶73   As our decision recognizes, there were two separate victims of Pope's conduct in this

case, A.J. and M.J.  That being the case, it follows that two separate offenses of sexual

intercourse without consent were allegedly committed.  Sections 46-11-404(1) and (3), MCA

(1991), provide:

> (1) *Two or more offenses* or different statements of the same offense
> may be charged in the same charging document in a separate count, or
> alternatively, if the offenses charged, whether felonies or misdemeanors or
> both, are of the same or similar character or are based on the same transactions
> connected together or constituting parts of a common scheme or plan.
> Allegations made in one count may be incorporated by reference in another
> count.  [Emphasis added.]

> (3) The prosecution is not required to elect between the different
> offenses set forth in the charging document, and the defendant may be
> convicted of any number of the offenses charged except as provided in 46-11-
> 410.  *Each offense of which the defendant is convicted must be stated in the*
> *verdict or the finding of the court.*  [Emphasis added.]

---

[1]Jane Doe and Susan Doe are A.J. and M.J.

26

¶74 Properly interpreted, this statutory language allows the prosecution the discretion to charge different offenses or different statements of the same offense in one information or charging document, but requires that separate offenses, as in the case at bar, be charged in separate counts. *Weldy*, 273 Mont. at 78, 902 P.2d at 7 (Nelson, J., concurring).

¶75 This statutory language does not contemplate what the prosecution did here--combine two separate offenses into one count by using language allowing for alternative choices. This sort of charging leads inevitably to jury confusion and, absent the trial judge giving a specific unanimity instruction, one can never be sure whether the jury unanimously agreed that the accused was guilty of crime A, crime B, or both. *See also State v. Hardaway*, 2001 MT 252, ¶¶ 8, 63-72, 307 Mont. 139, ¶¶ 8, 63-72, 36 P.3d 900, ¶¶ 8, 63-72 (holding that the trial court committed reversible error in failing to dismiss an amended information that charged the accused with committing burglary by entering the victim's home with the intent to commit "either a theft or a sexual crime" and in failing to give a specific unanimity instruction, noting that "if an accused is charged in the alternative, the jury must be clearly instructed that it is required to reach a unanimous verdict as to each individual alternative."); Brian M. Morris, *Something Upon Which We Can All Agree: Requiring a Unanimous Jury Verdict in Criminal Cases*, 62 Mont.L.Rev. 1, 24-34, (2001) (discussing in-depth the legal necessity for specific unanimity instructions under various scenarios under both federal and state law and also discussing the charging problem raised in *Weldy*).

¶76 Had Pope been properly charged, specific unanimity would have never become a problem, because the jury would have had to render its decision on each separate count--one count for A.J. and one count for M.J.--and, likewise, would have had to state its decision on

each separate count on the verdict form.

¶77    Because of the way Pope was charged and because of the trial court's failure to give a specific unanimity instruction, we do not know whether the jury believed Pope raped A.J., M.J., or both women.  Indeed, as a consequence, we cannot say for certain that Pope was convicted of raping either victim.

¶78    I concur.

/S/ JAMES C. NELSON

Justice Jim Rice dissenting.

¶79    I dissent.   The Court has applied *Schlup* in a manner neither required nor contemplated by that 1995 decision, and, in so doing, has improperly re-contoured our postconviction jurisprudence.  I would affirm the District Court.

¶80    For a proper understanding of the nature and effect of the *Schlup* decision, it is necessary to recognize the following principles and developments:

¶81    *1. **Schlup** was a capital case.*  Schlup's death sentence was the driving factor in the Court's adoption of a new miscarriage of justice, or "innocence" standard.  "The quintessential miscarriage of justice is the execution of a person who is entirely innocent. . . . The paramount importance of avoiding the injustice of executing one who is actually innocent thus requires application of the *Carrier* standard. . . . [T]he *Carrier* 'probably resulted' standard rather than the more stringent *Sawyer* standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar . . . . " *Schlup*, 513 U.S. at 324-27, 115 S.Ct. at 866-67, 130 L.Ed.2d at 834-36.

¶82    On October 14, 2003, the high court granted certiorari in a Fifth Circuit Court of Appeals case, *Haley v. Cockrell* (5th Cir. 2002), 306 F.3d 257, *cert. granted*, 2003 WL 21456653,which held that the *Schlup* innocence exception to the bar on successive federal habeas proceedings is not limited in its application to capital cases, but is also to be applied to noncapital sentencing cases involving a "career offender or other habitual offender."

*Haley*, 306 F.3d at 266.  The Seventh, Eighth and Tenth Circuits have already held that the *Schlup* standard does *not* apply in such circumstances.  *Haley*, 306 F.3d at 265.

¶83     Regardless of the high court's resolution of this sentencing issue, however, Pope was not sentenced to death, does not challenge his sentence and, therefore, does not come within the holdings of either *Schlup* or *Haley*.

¶84     **2. *Schlup* addressed the statutory bar to successive federal habeas petitions.**  *Schlup* defined a standard by which the federal statutory bar on successive habeas petitions, 28 U.S.C. § 2255, could be avoided.  "*Schlup* is a federal habeas corpus case involving a successive federal habeas petition and the federal test for when the bar against a successive petition can be avoided in order to permit the resolution of underlying constitutional claims on the merits."  *Beach v. Day* (1996), 275 Mont. 370, 375, 913 P.2d 622, 625. Unlike the federal statute, Montana law contains no bar on successive habeas corpus petitions.  *See* § 46-22-101, *et seq*., MCA (1993).  Further, Montana law does not bar the filing of successive postconviction relief petitions, but rather limits the issues raised in a successive petition to those which "could not reasonably been raised in the original" petition.  Section 46-21-105(1), MCA (1993).  This is Pope's first petition for postconviction relief, and, therefore, neither Montana's rule governing successive postconviction relief petitions–nor *Schlup*'s arguably analogous rule for successive federal habeas petitions–is applicable here.

¶85     **3. *Schlup* has not been applied to the time bar on federal habeas petitions.** Although application of the *Schlup* standard to the statute of limitations imposed by 28 U.S.C. § 2244(d)(1) upon federal habeas corpus petitions has been suggested, *see* Limin

Zheng, *Actual Innocence as a Gateway Through the Statute-of-Limitations Bar on the Filing of Federal Habeas Corpus Petitions*, 90 Cal. L. Rev. 2101 (2002), the federal courts have not yet done so.[2] If *Schlup* has not been applied to the federal time bar on habeas petitions, then neither can this Court be compelled to apply *Schlup* to the Montana time bar on postconviction petitions.

¶86    **4. *Schlup* did not displace state procedural bars.** "The Supreme Court's holding in *Schlup v. Delo*, *supra*, does not permit a petitioner to disregard a State's established postconviction procedures–or render the State powerless to insist on compliance with its procedures–whenever a claim of actual innocence is made." *Bates v. Commonwealth* (Mass. 2001), 751 N.E.2d 843, 845; *see also Hays v. State* (Idaho 1999), 975 P.2d 1181, 1184 (petitioner's *Schlup* claim did not excuse his failure to provide "reason or excuse as to why he did not raise this claim in his application for post-conviction relief" under state postconviction statute). Undoubtedly, the reasoning of *Schlup* may be properly considered in the ongoing development of actual innocence standards under state procedural bars, but blind adoption is not mandated. *See,* Gregory A. McCarthy, *Federal Habeas Corpus: A Backdrop for Providing a State Post-Conviction Remedy for Actual Innocence*, 37 AZ Attorney 22 (2000) (referencing *Schlup* in a discussion of whether *Carrier*, *Sawyer* or

_____

[2]The Ninth Circuit Court of Appeals refused to apply the actual innocence exception to the federal time bar in a one-page unpublished opinion issued in *Burton v. Fairman*, 2001 WL 925513 (9th Cir. Aug. 15, 2001), *cert. denied*, 2002 WL 407209 (March 18, 2002), as noted within the Zheng article.

*Herrera* should serve as the actual innocence standard for Arizona's postconviction remedy).[3]

¶87 Further, the actions of Congress will certainly influence the developing jurisprudence regarding an actual innocence standard. The *Schlup* rule has already been modified, at least slightly, by subsequent federal legislation. President Clinton's signing into law of the Antiterrorism and Effective Death Penalty Act of 1996 revised the innocence exception to the bar on successive federal habeas petitions under 28 U.S.C. § 2255. "The Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), Pub. L. No. 104-132, §§ 105, 110 Stat. 1214, provides new review procedures and more stringent standards for the review of second or successive motions pursuant to § 2255." *Robinson v. United States* (S. D. N.Y. Jan. 26, 1998), 1998 U.S. Dist. LEXIS 629 at *2; *see also Roldan v. United States* (7th Cir. 1996), 96 F.3d 1013, 1014.

¶88 Therefore, with a proper understanding of *Schlup*'s applicability to death sentence cases involving successive federal habeas petitions, and its failure to displace state procedural bars, particularly a state time bar, I conclude that Pope's claim can properly be determined on the basis of our existing postconviction jurisprudence. We have held that "the postconviction statute of limitations is a jurisdictional limit on litigation and is waived only when there is a clear miscarriage of justice, one so obvious that the judgment is rendered a complete nullity." *State v. Rosales*, 2000 MT 89, ¶ 7, 299 Mont. 266, ¶ 7, 999

---

[3] *Murray v. Carrier* (1986), 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397; *Sawyer v. Whitney* (1992), 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269; *Herrera v. Collins* (1993), 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203.

P.2d 313, ¶7. Further, "[t]he fundamental miscarriage of justice exception is concerned with actual and not legal innocence." *State v. Redcrow*, 1999 MT 95, ¶ 33, 294 Mont. 252, ¶ 33, 980 P.2d 622, ¶ 33.

¶89  Pope does not even attempt to assert he is actually innocent, and of course, he cannot, having confessed to the crime on two occasions. Although the confessions could not be used by the State to prove the charge against him, as they were obtained in the context of his plea bargain agreement, they are nonetheless evidence of his guilt that can be used by the State to defend against Pope's claim that he is "actually innocent." *See Bousley v. United States* (1998), 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 ("actual innocence" claims are subject to rebuttal by any evidence of the petitioner's guilt, even if inadmissible against the petitioner at trial). In any event, Pope has not and cannot meet the standard of actual innocence, and, therefore, his petition should be denied.

¶90  Pope nonetheless argues that he should be "considered" to be "innocent" because of new evidence that he did not commit the crime, combined with his claim that his trial was constitutionally defective, an argument which the Court adopts based upon *Schlup*. However, for the reasons expressed above, *Schlup* is inapplicable, and does not save Pope's claim. As the Court acknowledges, Pope's defective trial claims were record based. Pope could have appealed the faulty charge and instruction, but he did not. The pending DNA report from Cellmark Laboratories was known to Pope before trial, and he could have demanded dismissal of the charges for failure to produce evidence, requested a continuance of the trial until the evidence was produced, or objected to the preliminary DNA report

because of its incompleteness. He did not. With a trial challenge, he could have raised the issues on appeal. He did not. He has offered no reason or excuse for his failure to challenge on appeal the issues he now raises in a postconviction petition, which was untimely filed. Pursuant to § 46-21-105(2), MCA (1993), his failure to challenge these issues bars him from doing so now. Further, we have held that one in Pope's position is also barred from doing so by the operation of *res judicata*. *Beach*, 275 Mont. at 373, 913 P.2d at 624. Pope's conviction is final, and it is valid.

¶91 "Every inroad on the concept of finality undermines confidence in the integrity of our procedures; and, by increasing the volume of judicial work, inevitably delays and impairs the orderly administration of justice." *United States v. Timmreck* (1979), 441 U.S. 780, 784, 99 S.Ct. 2085, 2087, 60 L.Ed 2d 634, 639. Pope was charged with a vicious crime which he committed ten years ago last month. The law clearly calls for an end, and I would so order.

¶92 I dissent.

/S/ JIM RICE

Chief Justice Karla M. Gray joins in the dissent of Justice Rice.

/S/ KARLA M. GRAY