

DA 07-0305

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 180

IN THE MATTER OF THE WAGE CLAIMS
OF RENNE L. SMITH, JESSICA R. LABERDEE,
LORI L. NIENDORF, SARAH L. SARSFIELD,
TAMMY R. MAUSETH, TOMA D. CAMPBELL,
and MONICA G. HAMILTON,

        Claimants and Appellees,

   v.

TYAD, INC., a Montana corporation d/b/a
THE PLAYGROUND LOUNGE and CASINO,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
                    In and For the County of Cascade, Cause No. DDV 2005-1335
                    Honorable Dirk M. Sandefur, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Steven T. Potts, Thompson, Potts & Donovan, P.C., Great Falls, Montana

        For Appellees:

                Arthur M. Gorov, Montana Department of Labor and Industry, Helena,
                Montana

                                Submitted on Briefs:  April 16, 2008

                                      Decided:  May 20, 2009

Filed:

             _____
                          Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 TYAD, Inc., the Appellant, owned and operated the Playground Lounge and Casino in Great Falls, Montana, during all times relevant to this case. Several exotic dancers who performed at the Playground filed wage complaints against the lounge with the Department of Labor and Industry (DOLI or the Department). TYAD asserted the dancers were independent contractors, and therefore it owed no wages to them. DOLI disagreed and determined the dancers were employees.

¶2 TYAD also petitioned the Workers' Compensation Court (WCC) for a hearing to determine the dancers' status. The WCC also concluded the women were employees. TYAD did not appeal the WCC decision.

¶3 Subsequently, the Hearings Bureau of DOLI held a hearing to determine the amount of wages and other monies TYAD owed the dancers. After the final decision was issued, TYAD appealed it to the Eighth Judicial District Court. The District Court affirmed DOLI's determination of wages and monies owed to the individual dancers but modified and reduced the penalties assessed upon each of the claims. TYAD appeals. We affirm in part and reverse and remand in part.

## ISSUES

¶4 A restatement of TYAD's issues on appeal is:

¶5 Did DOLI exceed its jurisdiction by adjudicating non-wage claims and imposing penalties on recoveries that were not wages?

¶6 Did DOLI err by awarding recoveries to individual dancers who had assigned their claims to the Department?

¶7 Did DOLI err by determining that the WCC's decision was binding on TYAD under the doctrine of collateral estoppel?

¶8 Are DOLI's findings of fact and conclusions of law clearly erroneous, arbitrary, capricious, and an abuse of discretion?

¶9 Did the District Court err by denying TYAD's petition for judicial review with respect to each of the issues set forth above?

¶10 Appellee DOLI asserts that the dispositive issues on appeal are:

¶11 Was the determination by the WCC that the dancers were employees, rather than independent contractors, binding on TYAD?

¶12 Were there sufficient facts presented to the hearing examiner to determine the amount of money due from TYAD to each of the dancers?

¶13 Did the assignment of each dancer's claim to DOLI preclude the court from awarding money to them individually?

## FACTUAL AND PROCEDURAL BACKGROUND

¶14 Toma Campbell, Monica Hamilton, Jessica Laberdee and Tammy Mauseth performed as exotic dancers at the Playground between January 2003 and June 2004.[1] Campbell and Hamilton both danced at the lounge from the first week of January 2003 until the last week of June 2004. Laberdee performed at the Playground from January 1, 2003, until November 4, 2003, and Mauseth performed from August 1, 2003, until October 31, 2003.

---

[1] Renne Smith, Lori Niendorf, and Sarah Sarsfield, also named as claimants in this case, filed wage claims with DOLI around the same time as Laberdee and Mauseth but they are not parties to this appeal; therefore, their claims will not be discussed.

3

¶15    Prior to January 1, 2003, the Playground paid its dancers $5.15 per hour to perform in the lounge.  It withheld taxes from the wages and maintained appropriate employee records.  The dancers danced on stage while at work but were also allowed to perform private dances for customers off stage.  The dancers and the patron requesting a private dance negotiated a fee to be paid to the dancer.  In addition to this fee from the customer, the dancer remained "on the clock" for purposes of her hourly wage.  Because the dancers therefore arguably received double payment during private dances, each dancer was obligated to pay the Playground a $5 fee for each "lap" dance she performed and a $10 fee for each "hostage" dance she performed.

¶16    Beginning on January 1, 2003, TYAD required each dancer to sign a contract reflecting a change in the financial arrangements between TYAD and the dancers.  Under this Rental Agreement, the dancers would no longer be paid an hourly wage.  Instead, they would be considered "independent contractors," and they would pay a fee to "rent" the stage and a dressing room for every night they worked.  In return, they were allowed to retain all tips and dance fees they received from customers.  Initially, the stage fee was $15 for each Sunday, Monday, Tuesday and Wednesday evening, and $20 for Friday and Saturday evenings.  In late January 2003, however, the stage fees were set at $20 regardless of the night of the week.  In October 2003, the stage fees were changed again.  If a dancer began her shift at 4:00 p.m., when the lounge opened, her stage fee was $10.  If she performed a later shift, the stage fee was $25.  Additionally, the lounge again began requiring each dancer to pay the Playground $10 for each "hostage" dance she performed.

4

¶17     Each of the four claimants signed TYAD's agreement but subsequently filed wage claims against TYAD, asserting they were employees and entitled to payment of minimum wages.    Laberdee filed her claim on November 19, 2003, and sought $12,460.80 in regular and overtime wages, and reimbursement of the $4,400 in paid stage fees.    Mauseth filed her claim on January 21, 2004, seeking $1,606.80 in wages and $1,300 in stage fees.  Hamilton and Campbell filed their claims, respectively, on June 28 and 29, 2004.    Hamilton claimed $12,352 in wages and $7,000 in stage fees, and Campbell requested $14,832 in wages and $9,000 in stage fees.  Upon notice of the initial claims of Laberdee, Mauseth and other dancers not parties to this appeal, TYAD disputed them, asserting the dancers were independent contractors.  DOLI's Wage and Hour Unit, therefore, forwarded the claims to the Department's Independent Contractor Central Unit (ICCU) for a threshold determination of whether the women were employees or independent contractors.  In early March 2004, ICCU issued its written determination that the women were employees and returned the claims to the Wage and Hour Unit (Wage Unit) of the Department of Labor for determination of wages due and owing.

¶18     Shortly thereafter, the Wage Unit's assigned compliance specialist issued a "Determination" for each dancer.  In addition to calculating the unpaid wages due to each dancer, the Wage Unit determined that the stage rental agreements TYAD required the dancers to sign were in violation of Montana law.  As a result, these employer/employee agreements were declared to be void and the Unit determined that the dancers were entitled to reimbursement of stage fees they had paid to TYAD.

¶19 Pursuant to these Determinations, DOLI's Wage Unit instructed TYAD to pay Laberdee $17,041.32. This amount included regular wages, reimbursement of stage fees, and a 55% penalty of $6,046.92, for failure to pay wages in a timely manner. DOLI determined TYAD owed Mauseth $5,128.18, which included wages, stage fees and a 55% penalty. TYAD requested a redetermination of both awards. As a result, DOLI reviewed the claims again and adjusted Laberdee's award downward to a total of $16,837.34, and Mauseth's award upward to $6,165.90. In October 2004, after reviewing Campbell's and Hamilton's claims, the Wage Unit issued Determinations awarding Campbell $18,615.50 and Hamilton $21,176.72, both including 55% penalties.

¶20 TYAD appealed the wage determinations. The Wage Unit consolidated the claims and sent them to DOLI's Hearings Bureau where a hearing examiner was assigned to review them. At about the same time, TYAD filed a petition in the Workers' Compensation Court seeking review of DOLI's ICCU determination that the dancers were employees. In April 2005, the WCC affirmed ICCU's ruling, also concluding that the dancers were employees. TYAD moved for reconsideration. In August 2005, the WCC denied its motion. TYAD did not appeal the WCC ruling to this Court.

¶21 Meanwhile, in July 2005, the DOLI hearing examiner held a two-day hearing at which he took testimony from the four dancers as well as several witnesses for TYAD. In October 2005, the examiner issued his final decision. He awarded Campbell $13,604.19, Hamilton $14,143.75, Mauseth $2,983.90, and Laberdee $16,683.82. In November 2005, TYAD filed a Petition for Judicial Review in the Eighth Judicial District Court in Cascade County. In its Petition, TYAD claimed that the hearing examiner's

6

ruling should be reversed or vacated because the findings and conclusions (1) violated constitutional or statutory provisions; (2) were in excess of the agency's statutory authority; (3) were made on unlawful procedure; (4) were affected by other error of law; (5) were clearly erroneous; or (6) were arbitrary, capricious or an abuse of discretion.

¶22 In February 2007, the District Court affirmed the hearing examiner's final ruling with the exception of the imposition of a 55% penalty. The District Court reduced the penalty for each claim to 15%. TYAD filed a timely appeal.

## STANDARD OF REVIEW

¶23 Section 2-4-704(2), MCA, establishes the applicable standard of review of an administrative decision. It provides that when a district court reviews an agency decision, it may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. *Bitterroot River Prot. v. Bitterroot Cons.*, 2008 MT 377, ¶ 18, 346 Mont. 507, 198 P.3d 219 (citation omitted). Rather, the district court reviews the agency's decision to determine if the agency's findings of fact were clearly erroneous and whether its conclusions of law were correct. *Bitterroot*, ¶ 18. We apply this same standard to our review of a district court's decision to affirm an agency decision. *Bitterroot*, ¶ 18. In reviewing conclusions of law under § 2-4-704, MCA, we determine whether the agency's interpretation of the law is correct. *Bitterroot*, ¶ 18.

## DISCUSSION

¶24 *Did DOLI exceed its jurisdiction by adjudicating non-wage claims and imposing penalties on recoveries that were not wages?*

7

¶25    Citing § 39-3-209, MCA (2003),[2] TYAD argues that DOLI has jurisdiction over the dancers' wage claims and the assessment of penalties against wage claims. It asserts, however, that the stage fees paid by the dancers to TYAD were neither wages nor deductions from wages. Therefore, it submits that DOLI had no authority to adjudicate the dancers' requests for reimbursement of these fees. TYAD posits that the stage fees were a contractual obligation, "a condition of employment" pursuant to the Rental Agreement signed by all dancers working for TYAD. It opines that, at best, the stage fees were expenses to be reimbursed to the dancers, but argues that reimbursement of expenses is not within DOLI's jurisdiction. TYAD submits that DOLI exceeded its statutory authority by considering the stage fees in the dancers' claims, by requiring reimbursement of the fees, and by determining the penalty to be paid to each dancer based upon both the wages owed and the amount of stage fees paid.

¶26    In its response brief, DOLI does not address TYAD's argument regarding the appropriateness of adjudicating stage fees in a wage claim and the application of a penalty assessment against such fees. TYAD therefore asserts that DOLI's failure "to offer cogent arguments in opposition" to this issue constitutes a failure to comply with M. R. App. P. 12(b) (Rule 12(b)) (formerly M. R. App. P. 23(b)). Relying on *State v. Pope*, 2003 MT 330, 318 Mont. 383, 80 P.3d 1232, TYAD maintains that because DOLI failed to contest its position on this issue, we should reverse the District Court and the hearing examiner, presumably on the basis of TYAD's argument.

---

[2] This case is governed by the 2003 version of the Montana wage protection statutes since that law was in effect at the time of the claims. All references to the applicable statute in this Opinion will be to the 2003 version.

8

¶27 In *Pope*, Pope argued that his conviction was constitutionally infirm. While noting that the State failed to contest Pope's constitutional claim, we nonetheless analyzed the applicable law to determine if Pope's argument was sound. Upon concluding that it was, we reversed the district court. *Pope*, ¶ 70. As in *Pope*, we acknowledge DOLI's failure to contest this particular TYAD argument, but nonetheless review the agency's and District Court's decisions on this issue.

¶28 After receiving ICCU's determination that the dancers were employees, the Wage Unit, which was expressly bound by ICCU's ruling, evaluated each dancer's claim including the effect of the stage rental agreement on the claims. It determined that the stage rental agreement was in violation of § 39-3-208, MCA, which prohibits an agreement between an employer and employee in which the provisions of the agreement circumvent applicable wage law. The Wage Unit also concluded that the stage fees were impermissible withholdings and constituted kick-backs to TYAD. It ruled that TYAD had to reimburse the dancers for the stage fees.

¶29 The hearing examiner first noted that TYAD did not "dispute that the stage fees should be refunded in addition to the amounts of minimum wage due to the claimants." Nonetheless, he reiterated the Wage Unit's determination that the rental agreements were void under Montana law and that the stage fees constituted impermissible kick-backs under Admin. R. M. 24.16.1507. TYAD appealed this issue to the District Court and the court affirmed the agency decision adopting the same analysis.

¶30 We acknowledge that the issue of stage fees is factually unique and anomalistic but conclude that the District Court and DOLI correctly analyzed the applicable statutes,

9

regulations and a Montana attorney general opinion, Mt. Atty. Gen. Op. 25, Vol. 11 (March 25, 1953) which provided generally that an employer may not withhold wages due an employee except for room, board, or incidentals. Based on these authorities, DOLI and the District Court correctly concluded that the stage fees "amounted to" impermissible kick-backs as well as unreasonable withholdings or deductions from the income earned by the dancers.

¶31 As noted by the District Court, these agreements were designed by TYAD to circumvent Montana wage laws and to secure the services of the dancers in a manner that financially benefitted the Playground, and constituted contracts of adhesion. Additionally, it can be logically concluded that the stage fees were paid from the only remuneration the dancers received—their tips and the portion of private dance fees they were allowed to keep. Some dancers testified that they did not earn enough in tips and dance fees on some nights to make up for the stage fee they were charged. As such, not only did TYAD fail to pay the dancers earned wages, it demanded payment for providing essential elements of employment to the dancers, i.e., a stage and a dressing room.

¶32 Void employer/employee contracts, unlawful kick-backs, and improper withholdings or deductions are all employment matters addressed and regulated by the wage statutes and regulations. See §§ 39-3-201–217, MCA, and Admin. R. M. 24.16.1501-1510. It is therefore appropriate that DOLI have jurisdiction over these issues in this case. TYAD had the burden to establish error by the agency and the District Court, and it has failed to do so. Therefore we will not disturb DOLI's and the District Court's rulings that TYAD must repay the stage fees.

¶33 Finally, while TYAD appealed the imposition of any penalty on repayment of the stage fees, having concluded that the stage fees are subject to reimbursement under the wage statutes, we conclude they are also subject to the statutorily-mandated penalty under § 39-3-206, MCA. Neither party appealed the District Court's decision to lower the originally-imposed penalty from 55% to 15%; therefore, we affirm the payment of a 15% penalty on the total monies to be paid the dancers.

¶34 *Did DOLI err by awarding recoveries to individual dancers who had assigned their claims to the Department?*

¶35 Each dancer completed a standardized claim form with DOLI that contained the following language:

> I hereby assign all wages and all penalties accruing because of their nonpayment and all liens securing them to the Labor Commissioner of the State of Montana to collect in accordance with law. I authorize the Labor Commissioner and his/her deputies and agents to receive, endorse my name on and deposit any checks or money orders obtained as payment on this claim.

¶36 TYAD argues that as a result of this assignment to the labor commissioner, DOLI (both the Wage Unit and the hearing examiner) incorrectly ordered TYAD to make payment of the awards directly to the dancers. TYAD asserts that because of the assignment, it owes the dancers nothing, and the hearing examiner's decision ordering payment to the dancers should be reversed and the proceeding dismissed. It further submits that if the labor commissioner intends to pursue a claim based upon the assignments, he or she may do so in a separate agency proceeding or in a district court action. TYAD appealed the hearing examiner's ruling on this issue to the District Court

11

and the District Court affirmed DOLI's determination to order payment directly to the dancers.

¶37 While TYAD correctly argues the general contract principle that an unqualified assignment divests the assignor of any future right or standing to assert the assigned right, this principle is not applicable here where statutes and regulations dictate the procedure. Claimants chose to bring their claims under wage protection statutes §§ 39-3-209-212, MCA. Under the corresponding administrative regulations, specifically Admin. R. M. 24.16.7521, a wage claim "must be reduced to writing on the form furnished by the commissioner and signed by the person making the claim." Additionally, § 39-3-211, MCA, explains that these assignments are taken "in trust":

> Whenever the commissioner determines that one or more employees have claims for unpaid wages, he shall, upon the written request of the employee, take an assignment of the claim in trust for such employee and may maintain any proceeding appropriate to enforce the claim . . . .

¶38 The language utilized by DOLI on its standardized claim form does not constitute an unqualified contract assignment; rather, it expressly states that it is a "claim in trust" for the employee. Moreover, Admin. R. M. 24.16.7535 unequivocally allows DOLI to "require payment in either the department's or the claimant's name." It is apparent from the applicable statutes and regulations that DOLI has authority and standing to adjudicate the dancers' claims, to obtain a qualified assignment of their claims, and to instruct that payment be made directly to the claimants.

¶39 *Did DOLI err by determining that the WCC's decision was binding on TYAD under the doctrine of collateral estoppel?*

12

¶40    TYAD appeals the hearing examiner's ruling that the WCC's decision was binding on TYAD. The hearing examiner concluded that ICCU had determined the dancers were employees, and the WCC had affirmed that ruling. Because TYAD had not appealed the WCC's decision, he further concluded that TYAD was collaterally estopped from asserting at the wage determination hearing that the dancers were independent contractors. TYAD now claims that the WCC lacked jurisdiction to render its judgment, and therefore the hearing examiner erred in relying on it. TYAD made this same argument to the District Court. The District Court disagreed, as do we.

¶41    Section 39-71-415(3), MCA, states "[a] dispute between an employer and the department involving the issue of whether a worker is an independent contractor or an employee, but not involving workers' compensation benefits, must be brought before the independent contractor central unit of the department for resolution. A decision of the independent contractor central unit is final unless a party dissatisfied with the decision appeals by filing a petition with the workers' compensation court within 30 days of the mailing of the decision by the independent contractor central unit." Additionally, Admin. R. M. 24.35.206 also states that any disputes regarding ICCU's determination of employment status not involving workers' compensation benefits must be appealed to the WCC.

¶42    As stated above, the dancers filed their claims with DOLI asserting they were employees. DOLI notified TYAD of the claims and instructed it to pay the dancers the amounts claimed unless it disputed their assertions. TYAD replied that the dancers were independent contractors, not employees. DOLI, therefore, correctly sought a

13

determination of employment status from ICCU which TYAD challenged. At this stage, as set forth in § 39-71-415(3), MCA, TYAD, "an employer," was in a dispute with DOLI, "the department," involving whether a worker was an independent contractor or an employee. In accordance with applicable rules and regulations, TYAD pursued the WCC's review of ICCU's ruling.

¶43 Section 39-71-415, MCA, unequivocally grants jurisdiction to the WCC to review TYAD's dissatisfaction with ICCU's ruling. TYAD did not appeal the WCC's ruling; therefore, it became the law of the case. TYAD's argument to the contrary is not persuasive and we will not disturb the hearing examiner's or the District Court's ruling as regards this issue.

¶44 *Are DOLI's findings of fact and conclusions of law clearly erroneous, arbitrary, capricious, and an abuse of discretion?*

¶45 TYAD challenges certain of the hearing examiner's findings of fact. Four of the challenged findings arise from the examiner's determination of the number of shifts each dancer worked, the number of hours worked per shift, and the amount of remuneration she received for lap/hostage dances. TYAD asserts that the hearing examiner's miscalculations in shifts and hours worked and private dances performed resulted in miscalculations in the awards entered in favor of the claimants.

¶46 The best evidence for determining the number of shifts the dancers worked was the stage fee receipt books. Each dancer testified that if she danced, she paid a stage fee, and she received a receipt, a copy of which was kept by TYAD in the receipt books. As for the number of hours worked, neither TYAD nor the dancers kept records after TYAD

14

stopped paying wages. Each week, any dancer who wished to perform that week signed a sign-up sheet by putting her name by the shift she wanted to work; for example, from 4:00 p.m. until 2:00 a.m. on Tuesday night. While these sign-up sheets accurately reflect some of the hours the dancers worked, it was undisputed by all parties that the sign-up sheets were neither reliable nor accurate for purposes of determining the precise number of shifts and hours worked by each dancer. Because no accurate record of the dancers' hours existed, the hearing examiner accepted the testimony of each dancer as to the approximate length of the shifts she regularly chose.[3]

¶47 The fifth challenged finding addresses the testimony of two TYAD security guards pertaining to the number of private dances each claimant performed. TYAD and the dancers testified that a security guard was present each time a dancer performed a private dance. This was primarily for the protection of the dancer and to ensure the dancer got paid in the event she reported to security that a patron was refusing to pay for a requested dance. The hearing examiner found that the security guards could not accurately testify to how much each dancer was paid for private dances because they did not participate in the price-negotiating conversation between the dancer and the patron; therefore, the dancer's testimony was better evidence of the amount received. As to the number of dances each claimant performed, neither guard worked seven nights per week so there were nights the dancers performed when one or the other guard was not present. Based

---

[3] We recognize that by the time DOLI and the WCC determined TYAD to have employer status, it was too late for TYAD to assemble accurate wage and hour records. However, we again caution employers, pursuant to *Tefft v. State*, 271 Mont. 82, 94-95, 894 P.2d 317, 325 (1995), that it is not an employee's duty to maintain accurate wage and hour records; rather it is the employer's obligation.

15

on this, the hearing examiner concluded the guards were not able to give reliable estimates of the number of dances each woman performed during the tenure of her employment. Therefore, again, the hearing examiner concluded the best evidence came from the dancer herself.

¶48 As stated above, we may not substitute our judgment for that of the hearing examiner as to the weight of the evidence on questions of fact. *Bitterroot*, ¶ 18. *See also Mercer v. McGee*, 2008 MT 374, ¶ 22, 346 Mont. 484, 197 P.3d 961. Moreover, as long as we determine that substantial evidence exists to support his findings, we must defer to the hearing examiner. *Mercer*, ¶ 22. We also grant great deference to the hearing examiner's determination of witness credibility because he or she has the unique opportunity to hear and observe all the testimony entered in the case. *Mercer*, ¶ 22. Based on this deference, we defer to the hearing examiner's determination of the number of hours per shift each dancer worked, the number of private dances performed, and the remuneration received for such dances by each dancer.

¶49 The hearing examiner found that Campbell worked 191 six-hour shifts (1,146 hours) and did not work over forty hours during any week; therefore, she was not entitled to overtime pay. At $5.15/hour, she was entitled to $5,901.90 in unpaid wages. Based on the fluctuating amount of stage fees, the examiner calculated the number of $10, $20, and $25 stage fees Campbell had paid and determined that she paid a total of $4,075 in stage fees, for which she was entitled to reimbursement. The examiner also found, based on her testimony, that she received approximately $1,200 in payment from patrons for private dances. Completing the appropriate calculation, the hearing examiner added the

16

unpaid wages and the stage fees, arriving at a total of $9,976.90. He then subtracted the private dance fees of $1,200, arriving at a final fee of $8,776.90, other than penalties, owed by TYAD to Campbell.

¶50 TYAD asserts that Campbell worked only 184 shifts for a total of 1,003 hours, that the number of stage fees should be adjusted down to 184 fees, and that Campbell's testimony of $1,200 received for private dances was not based on credible evidence and should be increased. To support its determination that Campbell worked 184 shifts, it relies on Exhibit QQ, which was not included in the record provided to this Court. TYAD described Exhibit QQ as a summary of shifts and hours Campbell worked. TYAD's president, David Blackwell, testified that he and his secretary/bookkeeper reviewed the stage fee receipts and the dancer sign-up sheets and compiled such a summary for each claimant. While the record includes the compiled summaries for Laberdee and Mauseth, the summaries for Campbell and Hamilton were not included. As a result, we reviewed the stage fee receipts contained in the record for Campbell.

¶51 Based on the stage fee receipts, Campbell worked 192 shifts. She paid a stage fee of $10 for 9 shifts, a fee of $15 for 8 shifts, a fee of $20 for 99 shifts, and a fee of $25 for 76 shifts. As noted above, the dancers' sign-up sheet was not an accurate record of hours worked; therefore, the hearing examiner accepted Campbell's testimony that she generally chose to work six-hour shifts. Our calculation results in $5,932.80 in unpaid wages (192 shifts x 6 hours/shift x $5.15/hour) and $4,090 in stage fees, totaling $10,022.80. After subtracting $1,200 she received for private dances, TYAD owes Campbell $8,822.80 plus a 15% penalty of $1,323.42, for a total of $10,146.22.

17

¶52   Conducting a similar record review for Hamilton, the stage fee receipts indicate that she worked 200 shifts during her tenure with the Playground. This is the number derived by the hearing examiner as well. Two hundred shifts of 6 hours each times minimum wage of $5.15 per hour comes to $6,180 in unpaid wages owed to Hamilton. Inexplicably, however, the hearing examiner reimbursed her for 219 stage fees. The record indicates that she paid 49 $10 stage fees, a single $15 stage fee, 114 $20 stage fees and 36 $25 stage fees. This amounts to $3,685 in stage fees. Unpaid wages plus stage fees totals $9,865 less $1,000 in private dance payments results in TYAD owing Hamilton $8,865 plus a 15% penalty of $1,329.75, for a total of $10,194.75.

¶53   Reviewing the summary compiled by Blackwell and his bookkeeper on Mauseth, we agree that the evidence supports a finding that Mauseth worked 5 shifts between August 1 and October 31. Mauseth, as did the other dancers, testified that the receipt book was the best evidence of shifts worked and the receipt books indicate she worked 5 shifts—2 during the first week of September, a single the week of October 12 and 2 the week of October 19. Therefore, it was error for the hearing examiner to award her unpaid wages for 39 shifts and reimburse her for 39 stage fees based on her testimony. Calculating 5 6-hour shifts (30 hours) at $5.15/hour results in $154.50 in unpaid wages. The receipt books indicate that she paid a single stage fee of $10, 3 stage fees of $20 and a single stage fee of $25. This amounts to $95 in paid stage fees. Subtracting $60 for private dances results in TYAD owing Mauseth of $189.50 plus a 15% penalty of $28.43 for a total of $217.93.

18

¶54    Lastly, the summary compiled by TYAD on Laberdee's shifts and working hours is more accurate than the hearing examiner's determination but is still incorrect. Once again, using the stage fee receipts as the best evidence, our review indicates Laberdee worked 113 6-hour shifts for a total of 678 hours.[4] Multiplying these hours by $5.15 results in an unpaid wage computation of $3,491.70. Laberdee's stage receipts indicate that she paid 4 $10 stage fees, 2 $15 stage fees, and 107 $20 stage fees. Her paid stage fees total $2,210. Subtracting $250 for private dances Laberdee received, we conclude TYAD owes Laberdee $5,451.70 plus a 15% penalty of $817.76 for a total of $6,269.46.

¶55    Based on the hearing examiner's miscalculations, the corresponding conclusions of law were also incorrect and are vacated.

¶56    *Did the District Court err by denying TYAD's petition for judicial review with respect to each of the issues set forth above?*

¶57    We find this issue has no merit and decline to address it.

## CONCLUSION

¶58    For the foregoing reasons, we remand this matter to the District Court for remand to DOLI's Hearings Bureau for an order awarding the dancers the amounts calculated herein. We affirm the remainder of the hearing examiner's and the District Court's decisions.

/S/ PATRICIA COTTER

---

[4]    We note, as did the hearing examiner, that there were a few gaps in TYAD's receipt books. During the months in which these dancers worked, the stage fee receipts from February 2–4, 2003, and the receipts from July 3–13, 2003, were not in the record. As Blackwell testified he had done in compiling the summaries, if the claimant's name was on the sign-up sheet during these days, we gave her the benefit of a worked shift.

19

We concur:

/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ W. WILLIAM LEAPHART